

222 South Riverside Plaza • Suite 640 • Chicago, IL • 60606
**tel** 312-766-4450 • **fax** 312-766-4451 • wshblaw.com

**Zachary D. Fletcher**
**direct dial** (312) 766-4461
**email** zfletcher@wshblaw.com
**refer to** 10468-0167

April 6, 2023

**VIA EMAIL**
Acuity Insurance
c/o Tiger Fiber, Inc.

Tiger Fiber, Inc.
c/o Barry S. Noeltner
Heyl Royster
105 W. Vandalia St.
Mark Twain Plaza III, Suite 100
Edwardsville, IL 62025
BNoeltner@heylroyster.com

|  |  |  |
|---|---|---|
| Re: | ***Afton Chemical Corporation v. Tiger Fiber, Inc., and Jiva Resource, Inc.*** | |
| | Our Insured: | Jiva Resource, Inc. |
| | Claimant: | Afton Chemical Corporation |
| | Date of Loss: | 9/26/2022 |
| | Case No.: | [Pre-suit] |
| | Our File No.: | 05528.0436 |

Dear Mr. Noeltner:

As you are aware, our law firm has been retained to represent the interests of Jiva Resource, Inc. ("Jiva") in regards to the above-referenced claim made by Afton Chemical Corporation ("Afton"). This pre-suit matter stems from a September 26, 2022 fire at the storage facility (Warehouse No. 17) in the Eagle Industries Storage Warehouse, located at 2401 Mississippi Ave., Sauget, IL, which occurred two weeks after Tiger Fiber began leasing the portion of the premises where the fire started and storing a flammable substance (i.e. hemp) in this location. **Afton claims it sustained lost business revenue in the amount of $2,526,331.76 as a result of having to shut down its facility due to the fire.** (*See* attached 11/8/22 Letter.) This total includes fire-fighting efforts and resources ($40,627.76) and loss of revenue due to the plant shut-down ($2,485,704.00). We hereby tender the defense and contractual indemnification and seek additional insured coverage on behalf of Jiva.

Warehouse 17 consisted of 6 Bays. Jiva was leasing a portion of the space in Warehouse 17 to Tiger Fiber, Inc. ("Tiger Fiber") at the time of the fire. Under the terms of the September 6, 2022 Lease Agreement (hereinafter "Lease"), Jiva leased Bays 2, 4, 5, and 6 in Warehouse 17 to Tiger Fiber. (*See* Lease Agreement attached dated 9/6/22 attached as Exhibit 1.) Pursuant to Paragraph 6.4 of the Lease, Tiger Fiber took possession of the subject warehouse on September 15, 2022 "as is," and without any promise of improvements to the premises. The Lease further states that Jiva agreed to clean up Bays 2, 4, 5, and 6 by running a loader bucket to scrape material from the floor in those sections. Upon termination of the Lease, Tiger Fiber was to return the premises to the condition in which it was delivered, or better. Jiva specifically disclaimed any responsibilities for maintenance or repair of any part of the premises.

Exhibit E

Acuity Insurance/Tiger Fiber, Inc.
Our File No.: 10468-0167
December 9, 2022
Page 2

Pursuant to Paragraph 6.3 of the Lease, Tiger Fiber agreed that, "it shall not use, store, manufacture, dispose of or discharge and pollutants, contaminants, or harmful or hazardous substances from or on the Premises or otherwise occupy the Premises or permits its employees, agents, contractors, subtenants, licensees or invitees to occupy or use the Premises in a manner which (i) violates any law, regulation, rule, or other governmental requirement, (ii) impairs the health, safety or condition of any person or property, or (iii) adversely affects the use, enjoyment or value of the Premises of surrounding property."

We have also enclosed the Certificate of Insurance that Tiger Fiber provided to Jiva which states that Jiva Resource, Inc. is the certificate holder.  (*See* COI attached as Exhibit 2.)

Paragraph 8.5 of the Lease provides:

> **Indemnity**.  Tenant shall indemnify and hold harmless Landlord, its agents and employees, from and against any and all claims arising from:  (a) Tenant's use of the Premises, (b) the conduct of Tenant's business or anything else done or permitted by Tenant to be done in or about the Premises or the Building, (c) any breach or default in the performance of Tenant's obligations under the Lease, or arising from any negligence of Tenant, or Tenant's agents, contractors or employees.  Tenant shall defend Landlord against all costs, attorneys' fees, expenses and liabilities incurred in the defense of any such claim, action or proceeding.  In case any action or proceeding is brought against Landlord <u>by reason of a claim</u>, Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by counsel satisfactory to Landlord.  Tenant assumes all risk of damage to property or injury to persons, in or about the Premises arising from any cause and Tenant waives all such claims against Landlord, except claims due to Landlord's gross negligence of willful misconduct.

There is no doubt that under the terms of the Lease, that there is no requirement that a lawsuit be filed to trigger Tiger Fiber's defense and indemnity obligations to Jiva. This was the express agreement entered into between Tiger Fiber and Jiva. A claim, like the one made by Afton Chemical, is sufficient to trigger the obligations of both defense and indemnity by Tiger Fiber *regardless of any position taken by its insurance carrier*.

Pursuant to Paragraph 7.1 of the Lease, Tiger Fiber was to "be solely responsible to perform, at its sole cost and expense, all repairs and maintenance to any and all portions of the Premises and appurtenant easement areas, and maintain the same in good order and condition, subject only to normal wear and tear and to keep the same in such condition as to comply from time to time with all applicable laws, ordinances or regulations of all public authorities and all restrictions or indentures affecting the Premises."  Moreover, under Section 7.2, "Landlord has no responsibilities for maintenance or repair of any part of the Premises."

With respect to insurance required, Paragraph 8.1 is instructive:

> "**Liability Insurance.**  During the Lease Term, Tenant will maintain a broad form policy of comprehensive general liability insurance insuring Landlord and Tenant against liability arising out of the use, occupancy or maintenance of the Premises.  The insurance will not be for less than $1,000,000.00 combined single limit personal injury and property damage.  <u>The limits of the insurance will not limit the liability of Tenant</u>.  The policy will contain cross-liability endorsements, if applicable, and will insure Tenant's performance of the indemnity provisions of Paragraph 8.5.  If Tenant fails to maintain the required insurance, Landlord may, but is not obligated to maintain the insurance at Tenant's expense.  The

Exhibit E

Acuity Insurance/Tiger Fiber, Inc.
Our File No.: 10468-0167
December 9, 2022
Page 3

       policy shall expressly provide that it is not subject to invalidation of Landlord's interest by
       reason of any act or omission on part of Tenant."

As stated above, two weeks after Tiger Fiber began leasing a portion of the premises, the fire occurred. There is no doubt that Tiger Fiber's materials, specifically the bales of hemp with bags of processed hemp mulch underneath, were hazardous materials and combustible, and were the only plausible cause of the fire in Warehouse 17.  As Sauget Fire Chief, Roger Thornton stated publicly, the fire was caused by spontaneous combustion from the mulch (obviously, referring to the hemp) being stored in the building.  Clearly, the tires and corrugated fiberglass being stored in the building did not contribute to the cause of the fire, and the inspections performed to date have revealed no other potential source of the fire.  **In fact, the building had no power, gas or water or other utilities**. Tiger Fiber's use of the building was clearly a direct and proximate cause of the damages being claimed by Afton.

Pursuant to the above, Jiva Resources, Inc. hereby tenders its defense and indemnity of the claim by Afton Chemical Corporation, to Tiger Fiber and its insurance carrier(s), including Acuity.  Regardless of Acuity's "coverage" position based on the language of any insurance policy procured by Tiger Fiber, Tiger Fiber expressly agreed to defend and indemnity Jiva for the subject loss according to the express provisions of the parties' Lease.  As a result, we expect that Tiger Fiber and/or its carriers, including Acuity, will reimburse Jiva and its insurer for the fees and costs associated with defending this matter, which are accruing and will continue to accrue.

Also per this letter, we request that Tiger Fiber and/or its carriers, including Acuity, to provide us with a copy of any and all primary and excess CGL policies in effect on the date of loss along with any additional certificates of insurance not referenced herein or included herewith, and any other insurance policies procured by Tiger Fiber that could potentially cover this loss.

**We also ask that Tiger Fiber and/or its insurance carrier(s), including Acuity, provide a written response to this tender of defense and indemnity within 30 days** since the parties will continue to incur defense fees and costs associated in defending this matter.  If we do not receive a response within that timeframe, Jiva may proceed with filing a crossclaim against Tiger Fiber for contributory negligence, breach of contract and contractual indemnity, and will continue to pursue indemnity for its defense costs as well as any judgment rendered against it.

If you have any questions or concerns, please do not hesitate to contact me directly at (312) 766-4461.

Very truly yours,

**WOOD, SMITH, HENNING & BERMAN LLP**


By: _Zachary D. Fletcher_____
    ZACHARY D. FLETCHER

ZDF:ZDF

Enclosures: 11/8/22 Letter from Afton, Lease Agreement, COI

cc:    Craig M. Derrig, *via email;* Suzanne Braun, *via email*

Exhibit E

Bryce D. Jewett III
Vice President
General Counsel
Direct: 804.788.5515
Fax:   804.788.5519
Bryce.Jewett@NewMarket.com



NewMarket Corporation
330 South Fourth Street
Richmond, Virginia 23219-4350
tel: 804.788.5600
fax: 804.788.5688

November 8, 2022

Tim Hurley
1187 Corporate Lake Drive, S300
Saint Louis, Missouri 63132
tim.hurley@39nproperties.com

Li Cheng
1187 Corporate Lake Drive, S300
Saint Louis, Missouri 63132
li.cheng@39nproperties.com

Holly Tang
1187 Corporate Lake Drive, S300
Saint Louis, Missouri 63132
holly.tang@39nproperties.com

Dear Messrs. Hurley and Cheng and Ms. Tang:

I am writing on behalf of Afton Chemical Corporation ("Afton") – a wholly-owned subsidiary of NewMarket Corporation – in connection with a loss arising from a fire originating at Eagle Industries' storage warehouse on or about September 26, 2022.

You may or may not know that Afton was called upon to assist the Sauget Fire Department with extinguishing the fire before it spread to Afton's property. Due to the fire, and resulting precautionary activities, Afton suffered a loss of production and incurred other costs. Please accept this correspondence as a demand for reimbursement of those costs. Please forward this correspondence to any liability insurance carrier(s) with a policy that covers this loss.

**I.  Summary of Events**

On September 26, 2022, Afton's chemical plant located in Sauget, Illinois experienced a shut-down of plant production resulting from a fire originating at the neighboring Eagle Industries' warehouse. As a result of the fire, smolder, and smoke hazard in close proximity to Afton's plant, Afton was required to shut down production for approximately 24 hours.

Further, following the shutdown of plant production, Afton's emergency response necessitated overtime to support the plant shut down and assist the Sauget Fire Department. Afton supplied dust masks and respirators, for use in fighting the fire. Due to the excessive smoke infiltration, Afton was forced to replace its HVAC system filter.

ADDITIONAL NEWMARKET CORPORATION SUBSIDIARIES



Ethyl Corporation
330 South Fourth Street
Richmond, Virginia 23219

Exhibit E



Afton Chemical Corporation
500 Spring Street
Richmond, Virginia 23219

Messrs. Hurley and Cheng and Ms. Tang
November 8, 2022
Page 2

In summary, as a result of the fire originating at Eagle Industries' storage warehouse, Afton experienced a loss of production and incurred other expenses from assisting with extinguishing the fire and remediating smoke impact in operating units. Due to safety concerns relating to the proximity of Afton's operations to the Eagle Industries fire, Afton was required to shut down production of lubricant additives.

## II.  Damages

The combined total damages sustained by Afton are $2,526,331.76. This total includes costs accrued fire-fighting efforts and resources ($40,647.76) and loss of revenue due to the plant shut down ($2,485,704.00). We have enclosed a damage summary supporting documentation for your review. We request you promptly refund Afton $2,526,331.76 for the costs incurred and the loss of production experienced.

## III. About NewMarket and Afton

NewMarket Corporation, through its subsidiaries Afton Chemical Corporation and Ethyl Corporation, develops, manufactures, blends, and delivers chemical additives that enhance the performance of petroleum products. Afton's plant in Sauget, Illinois has been in production since 1975.

Thank you for your attention to this matter. Please do not hesitate to contact me with any questions or concerns you may have.

Sincerely,

Bryce D. Jewett III
Vice President & General Counsel

Exhibit E

**Sauget Plant  - Eagle Industries Fire Costs**

Fire Ocurred  9/26/2022
Plant production units shutdown and evacuated @ 3:49pm 9/26/2022
Plant all clear for start up 1:49pm 9/27/22

| Cost Detail | Afton Cost |
|---|---|
| Afton emergency response team overtime incurred to support plant shutdown and asssit Sauget fire department  72hours @$57.33 hr  $4,127.76 | $4,127.76 |
| Afton safety supplies consumed M95 dust masks and respirators - $1500.00 | $1,500.00 |
| Contractor costs including contractor working on site that were evacuated from their jobs and control room purafil HVAC system filter replacement | $35,000.00 |

| Sauget Plant Lost production | Production volume  (MT) lost | Product Value @Sept cost/mt $2418.00 |
|---|---|---|
| Unit 270 H611 | 150 | $362,700.00 |
| Unit 258 H052 | 160 | $386,880.00 |
| Unit 258 H6949 | 120 | $290,160.00 |
| Unit 283 Engine Oil Blending | 100 | $241,800.00 |
| Unit 266  Zinc Diathiophosphate (ZDDP) | 49 | $118,482.00 |
| Unit 267A Gear Specialties | 6 | $14,508.00 |
| Unit 267F Automotive Gear Blending | 45 | $108,810.00 |
| Unit 280 Sulfurized Isobuytlene (SIB) | 39 | $94,302.00 |
| Unit 268B Industrial Blending | 4 | $9,672.00 |
| Unit 268C Automatic Transmission Fluid Blending | 54 | $130,572.00 |
| Unit 275 dispersant H644 | 279 | $674,622.00 |
| Unit 290 Thiadiazole H4313 | 22 | $53,196.00 |
| **Total** | | **$2,485,704.00** |

| **Total Plant Costs** | **$2,526,331.76** |
|---|---|

# DRAFT LEASE AGREEMENT

INFORMATION SCHEDULE

This Information Schedule is a part of the Lease between the parties named below.  The information in this Schedule is further explained and detailed in the rest of the Lease.

INFORMATION

DATE OF LEASE: _____

PARTIES:

LANDLORD: Jiva Resources, Inc.
2401 Mississippi Ave
Sauget, IL 62201

TENANT: Tiger Fiber Hemp Company
Attn: James Forbes
314-482-2433
james@tigerfiberhemp.com

PREMISES: Eagle industrial Park located at 2401 Mississippi Ave, Sauget IL 62201 Building 17,  26,400 sf of warehouse space

POSSESSION: The "Date of Possession" shall be  September 15th , 2022

RENT and TERM: **Initial term is 12 months and automatically renew annually if not terminated by either party.**
**Rent rate automatically increase 3% annually**

| Term | Annual Rent | Monthly Rent |
|------|-------------|--------------|
| Year 1 | $24,000.00 | $2,000.00 |

ADDITIONAL RENTS: Tenant's share of the Operating Costs including, but not limited to, real estate taxes, property insurance premiums, utilities, utility meter installation fee, indoor maintenance & outdoor maintenance is established at one hundred percent (100%).

| Estimated Additional Rents | Annual | Monthly |
|----------------------------|--------|---------|
| Real Estate Taxes | $2,584.60 | $215.38 |
| Property Insurance | $2,450.00 | $204.17 |

Exhibit E

Landlord's Work

Tenant will take the Premises as is. Landlord will not make any improvements to the Premises. Any alternation or improvement to Premises is subject to landlord's approval. Landlord will keep the material/equipment in section 1 and section 3, clean up section 2,4,5,6. Landlord will have run a loader bucket to scrape the material from floor in Section 2,4,5,6. (See section figure below)

| 1 Landlord Keep | 2 | 3 Landlord Keep | 4 | 5 | 6 |
|---|---|---|---|---|---|
| | | | | | |

Tenant's Work

Tenant must clean section 2, 4, 5, 6 of the premises at the condition delivered or better at the end of lease

SECURITY DEPOSIT:

The Security Deposit is $8,250.00; to be deposited with Landlord simultaneously with the execution of this Lease

PERMITTED USES:

Manufactory, warehouse

ADDITIONAL EXHIBITS:

The following Exhibits are attached to and made a part of this Lease:

A. Eagle Industrial Park Map

Exhibit E

## DRAFT LEASE AGREEMENT

1.    **Parties.** This Lease Agreement is made as of the date shown in the Information Schedule, between the parties as provided in said Schedule.

2.    **Premises.**

2.1    **Premises.** In consideration of the agreements in this Lease and other consideration paid, Landlord leases to Tenant and Tenant leases from Landlord:

    (a) The "Premises" is the land and building shown on Exhibit A.

3.    **Improvements, Date of Occupancy**.

3.1    **No Landlord Improvements.** Tenant accepts the Premises "as is." Landlord will make no improvements.

3.2    **Possession.** Landlord shall provide possession of the Premises to Tenant by the date shown in the Information Schedule. Tenant is responsible for obtaining its occupancy permit.

4.    **Term: Commencement and Termination.** The Lease Term is as provided in the Information Schedule. This Lease is terminable by both Landlord and Tenant with Thirty (30) days written termination notice in advance of the effective date.

5.    **Rents, Security Deposits**

5.1    **Fixed Minimum Rent.** Tenant agrees to pay Landlord Fixed Minimum Rent ("the Rent") for the Premises in the amounts listed in the Information Schedule. The Rent will be paid in equal monthly installments, in advance, without offset, deduction or prior demand, on the first day of each month of the original and any renewal Lease Term.

5.2    **Additional Rent.** Landlord and Tenant agree that except for the obligations of Landlord specifically set forth elsewhere in this Lease, this Lease is a Net, Net, Net (NNN) lease, which means that Lessee shall pay as additional rent, without defense, offset or deduction, all expenses connected with the Premises including, but not limited to, real and personal property taxes and assessments, fire and extended coverage insurance premiums, liability and damage insurance premiums, parking lot and common area maintenance expenses, and all expenses of maintenance and repair of the Premises, including maintenance, repair and replacement of building systems.

5.3    **Rent Obligations Independent; Abatement; Proration; Where Payable; Late Charges.** The rent obligations are independent of any other obligations of Tenant or Landlord, and Tenant is not entitled to any abatement or reduction in rent except as expressly provided. Rent due for any period which is less than one month will be prorated. Rent is payable to Landlord at the address listed in the Information Schedule or such other place as Landlord may designate from time to time in writing. A five percent (5%) handling fee is due on any rent not paid within ten (10) days of the due date, unless Landlord elects to pursue actions under Paragraph 13.

5.4    **Security Deposit.**  Simultaneous with Tenant's execution of the Lease Agreement, Tenant shall deposit with Landlord a Security Deposit in the amount provided in the Information Schedule. Landlord may apply all or part of the Security Deposit to any unpaid rent or other charges due from Tenant or to cure any default of Tenant.  If Landlord uses any part of the Security Deposit, Tenant shall restore the Security Deposit to its full amount within ten (10) days after Landlord's written request.  Tenant's failure to comply with this provision shall be a material default.

6.    **Use.**

6.1    **Use.**  Tenant covenants and agrees to use the Premises for no purpose other than those listed in the Information Schedule.

6.2    **Compliance with Law.**  Tenant, at its expense, will comply promptly with all statutes, ordinances, rules and regulations, order and requirements in effect during the Lease Term regulating the use of the Premises by Tenant.  Tenant will not carry on, nor permit any dangerous or offensive activity so as to create damage to the Property.

6.3    **Environmental Protections.**  Tenant acknowledges that there are in effect federal, state and local laws, regulations and guidelines, and that additional and other laws, regulations, and guidelines may hereinafter be enacted to take effect relating to or affecting the Premises, and concerning the impact on the environment of construction, land use, maintenance and operation of structures, and the conduct of business. Tenant will not cause or permit to be caused, any act or practice, by negligence, omission, or otherwise that would adversely affect the environment, or do anything or permit anything to be done that would violate any of said laws, regulations or guidelines.  Tenant agrees that it shall not use, store, manufacture, dispose of or discharge any pollutants, contaminants, or harmful or hazardous substances from or on the Premises or otherwise occupy the Premises or permit its employees, agents, contractors, subtenants, licensees or invitees to occupy or use the Premises in a manner which (i) violates any law, regulation, rule or other governmental requirement, (ii) impairs the health, safety or condition of any person or property, or (iii) adversely affects the use, enjoyment or value of the Premises or the surrounding property.  Tenant shall promptly notify Landlord of the breach, or the potential or threatened breach, of any of the provisions of this Paragraph. Landlord shall have the right of access to the Premises to inspect, test, and in Landlord's sole discretion, remedy any potential environmental problem which Tenant is obligated to remedy hereunder, but has failed or refused to do so within sixty (60) days after written notice thereof from Landlord.   Tenant shall indemnify, defend, protect and hold Landlord, its employees, agents, officers and directors, harmless from and against all claims, accidents, suits, proceedings, judgments, losses, costs, damages, liabilities (including, without limitation, sums paid in settlement of claims), deficiencies, fines, penalties, punitive damages or expenses (including, without limitation, reasonable attorneys', experts' and consultants' fees, investigation and laboratory fees, court costs and litigation expenses) resulting from any adverse effect to the environment by Tenant, directly or indirectly, resulting from the presence of any hazardous materials in, on, or under the Premises that were introduced to the Premises by Tenant.  All obligations of Tenant under this Paragraph 6.3 shall survive the expiration or earlier termination of this Lease.

6.4    **Condition of Premises.**  Tenant accepts the Premises in the condition existing as of the date of this Lease.  Tenant accepts the Premises subject to all applicable zoning, municipal, county, state and federal laws, ordinances and regulations governing the use of the Premises and to any covenants or restrictions of record, and matters disclosed by any attached exhibits.

Exhibit E

7.      **Maintenance, Repairs and Alterations.**

7.1     **Tenant's Obligations.**     During the Lease Term, Tenant shall maintain and keep the Premises, fixtures and equipment in good and clean order, condition and repair, including, but not limited to, all windows and doors and their fixtures, loading dock equipment (dock levelers, overhead doors, dock shelters, seals and bumpers), pavement, electric system, lighting (fixtures, bulbs, ballasts, starters and diffusers), plumbing, heating and cooling systems and equipment, floors, sprinkler system, electrical systems, roof (and roof membrane, if any) repairs and replacements, and all repairs to exterior walls and foundation and structural members, interior wall surfaces, interior partitions, mezzanines, landscaping, irrigation systems, cleaning, snow removal, lighting, pest control, security costs, supplies, trash removal and parking lot maintenance.  Tenant will maintain maintenance contracts satisfactory to Landlord covering the air conditioners and insurance policies covering boilers.  Landlord and Tenant acknowledge and agree that it is the intent of the parties that Tenant shall be solely responsible to perform, at its sole cost and expense, all repairs and maintenance to any and all portions of the Premises and appurtenant easement areas, and maintain the same in good order and condition, subject only to normal wear and tear and to keep the same in such condition as to comply from time to time with all applicable laws, ordinances or regulations of all public authorities and all restrictions or indentures affecting the Premises.

Tenant agrees to store trash in suitable containers outside the Building.

Tenant shall not place a load upon any floor of the Premises exceeding the floor load per square foot area which such floor was designed to carry, and which is allowed by law.

7.2     **Landlord's Obligations.**  Landlord has no responsibilities for maintenance or repair of any part of the Premises.

7.3     **Surrender of Premises.**  At the end of the term, or any other termination, Tenant will return the Premises in good, clean condition and operating order, after completing all maintenance, repair and replacement which is Tenant's responsibility.  Damage by ordinary wear and tear is excepted to the extent that it is not part of Tenant's obligation to maintain, repair and replace.  Extraordinary wear and tear due to Tenant's use of the Premises is the responsibility of Tenant.  Damage to the Premises caused by Paragraph 7.4(c) removals will be repaired by Tenant.

7.4     **Alteration and Additions.**

7.4(a)  **Consent.**  Tenant will not make any alterations or improvements to the Premises, or changes to the exterior of the Premises, or the exterior of the Building without Landlord's prior written consent. Landlord may condition its consent with any of the following:

(i)      Tenant's agreement to remove any alterations or improvements upon termination, and to restore the Premises to the prior condition.

(ii)     A lien and completion bond equal to one and one-half times the estimated cost of improvements.

(iii)    Insurance necessary to protect both parties while work is in progress.

(iv)     Waivers of Liens from all contractors or sub-contractors involved in the alterations or improvements.

Exhibit E

7.4(b)  **Liens.**  Claims for labor or materials for, or purporting to be for, labor or materials furnished to Tenant shall be paid by Tenant when due, or secured by bond satisfactory to Landlord, so as to immediately discharge any liens filed against the Premises or Building.  In the event Tenant does not discharge any such liens, Landlord shall have the right, but not the obligation, to discharge such liens.  Any such amount paid or incurred by Landlord shall be immediately due and payable as additional rent by Tenant to Landlord together with interest at the rate indicated in Paragraph 24.10 from the date of payment by Landlord until paid by Tenant.

7.4(c)  **Surrender or Removal of Alterations.**  Unless removal is required by Landlord, at Landlord's option, all alterations or improvements will become the property of Landlord and will be surrendered with the Premises at the end of the Lease Term or other termination without payment. Tenant's machinery and equipment, unless it is fixed to the Premises so that it cannot be removed without material damage, remains the property of Tenant and may be removed by Tenant subject to Paragraph 7.3.

8.  **Insurance.**

8.1  **Liability Insurance.**  During the Lease Term, Tenant will maintain a broad form policy of comprehensive general liability insurance insuring Landlord and Tenant against liability arising out of the use, occupancy or maintenance of the Premises.  The insurance will be for not less than $1,000,000.00 combined single limit personal injury and property damage.  The limits of the insurance will not limit the liability of Tenant.  The policy will contain cross-liability endorsements, if applicable, and will insure Tenant's performance of the indemnity provisions of Paragraph 8.5. If Tenant fails to maintain the required insurance, Landlord may, but it is not obligated to, maintain the insurance at Tenant's expense.  The policy shall expressly provide that it is not subject to invalidation of Landlord's interest by reason of any act or omission on the part of Tenant.

8.2(a)  **Casualty Insurance.**  During the term of this Lease, Tenant at its sole cost and expense, shall keep all improvements on the Premises insured against loss or damage by fire and the hazards covered by all risk coverage insurance (including earthquake coverage) in an amount equal to not less than the full replacement value of such improvements without offset for depreciation.  The policy or policies therefor shall provide for payment for any loss to Landlord with a waiver of subrogation clause and a standard mortgagee clause in favor of the holder of any mortgage or deed of trust (the "mortgagee") on the fee of the Premises.  Said policy or policies shall also insure Landlord against loss of rents for a period of one (1) year.  The policy or policies shall in all respects and amounts be acceptable to Landlord and the mortgagee.  Tenant shall not commit or permit any acts in or about the Premises which may in any way impair or invalidate such policy or policies of insurance. The full replacement of such improvements shall be determined from time (but not less often than once every three (3) years) by Landlord and Tenant's insurer or insurers.

8.2(b)  **Tenant's Personal Property.**  Tenant shall be solely responsible for procuring and maintaining throughout the entire term of this Lease, fire and extended coverage insurance in an amount equal to the full replacement value of all personal property, furniture, appliances, equipment, trade fixtures and other property of Tenant affixed to or brought upon the Premises, insuring Tenant against loss or damage to such property by fire or other casualties covered by the standard form of fire and extended coverage insurance.  Tenant assumes all risk of loss or damage to Tenant's Property.  Tenant assumes the risk that loss or damage to Tenant's Property, to the Premises or to the Property may result in loss of income, profits or good will to the business of Tenant or other persons interested in Tenant's property. Tenant releases and holds Landlord harmless from liability for these losses or damage, except for those arising out of Landlord's gross negligence or willful misconduct. Tenant's property includes all goods, equipment, inventory, merchandise, records and

other personal property and all fixtures, improvements and betterments placed in or about the Premises which belong to Tenant or any person connected with, or claiming under or through Tenant. Tenant agrees to indemnify Landlord and save it harmless from all loss or claims, including reasonable attorneys' fees and costs in defending a claim, arising out of loss or damage to Tenant's property. Landlord means Landlord, its employees and agents.

TENANT, AT ITS SOLE COST AND EXPENSE, SHALL OBTAIN THE INSURANCE COVERAGES NECESSARY TO PROVIDE PROTECTION FOR THE RISKS AND OBLIGATIONS TO INDEMNIFY ASSUMED BY TENANT AND SHALL MAINTAIN SUCH INSURANCE FOR THE LEASE TERM. TENANT AGREES TO NOTIFY EACH INSURANCE CARRIER OF THE TENANT'S ASSUMPTION OF RISK, RELEASE AND INDEMNIFICATION STATED ABOVE. TENANT ACKNOWLEDGES THAT ITS INSURANCE COVERAGES COULD BE VOIDED OR OTHERWISE ADVERSELY AFFECTED BY THE FOREGOING PARAGRAPH UNLESS THE INSURANCE CARRIER HAS WAIVED ITS RIGHT OF SUBROGATION OR HAS OTHERWISE AGREED TO THE ABOVE ASSUMPTION OF RISK, RELEASE AND HOLD HARMLESS AGREEMENT AND INDEMNIFICATION.

8.3(a)  **Tenant's Insurance Policies.** Insurance carried by Tenant will be with responsible carriers acceptable to Landlord and licensed in the State in which the Premises is located. Prior to Possession, Tenant will deliver to Landlord certified copies of the policies of insurance or certificates evidencing the existence and amounts of insurance. No policy shall be cancelable or subject to reduction of coverage or other modification except after thirty (30) days' prior written notice to Landlord. Tenant shall, at least thirty (30) days prior to the expiration of the policies, furnish Landlord with renewals or "Binders" for the policies, or Landlord may order the required insurance and charge the cost to Tenant pursuant to Paragraph 23.

8.3(b)  **Increased Risk.** Tenant will not do anything or permit anything to be done or any hazardous condition to exist ("Increased Risk") which shall invalidate or cause the cancellation or the insurance policies carried by either Tenant or Landlord. If Tenant does or permits any Increased Risk which causes an increase in the cost of Landlord's insurance policies, then Tenant shall reimburse Landlord pursuant to Paragraph 23 for additional premiums attributable to any act, omission or operation of Tenant causing the increase in premiums, including, but not limited to, non-compliance with recommendations under Paragraph 6.2. Payment of additional premiums will not excuse Tenant from terminating or removing the Increased Risk unless Landlord agrees in writing. Absent agreement, Tenant shall promptly terminate or remove the Increased Risk.

8.4  **Waiver of Subrogation on Property Policies.** Each party releases the other party from any and all liability or responsibility (to the other party or anyone claiming through or under them by way of subrogation or otherwise) for loss or damage to property resulting from caused insured against, if such casualty has been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible, provided that the Lease provided for herein shall in any event apply only if and to the extent that insurance proceeds are in fact paid to or for the account of the party giving the release hereunder.

8.5  **Indemnity.** Tenant shall indemnify and hold harmless Landlord, its agents and employees, from and against any and all claims arising from: (a) Tenant's use of the Premises, (b) the conduct of Tenant's business or anything else done or permitted by Tenant to be done in or about the Premises or the Building, (c) any breach or default in the performance of Tenant's obligations under the Lease, or arising from any negligence of Tenant, or Tenant's agents, contractors or employees. Tenant shall defend Landlord against all costs, attorneys' fees, expenses and liabilities incurred in

the defense of any such claim, action or proceeding. In case any action or proceeding is brought against Landlord by reason of a claim, Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by counsel satisfactory to Landlord. Tenant assumes all risk of damage to property or injury to persons, in or about the Premises arising from any cause and Tenant waives all such claims against Landlord, except claims due to Landlord's gross negligence or willful misconduct.

9.    **Casualty Damage.**

9.1    **Damage to Premises.** Tenant will give immediate notice to Landlord of fire or other casualty damage to the Premises. Landlord will repair the Premises, except damage from items for which Tenant is responsible for under Paragraph 6.3 herein and unless it decides to terminate this Lease under Paragraph 9.2. Tenant will be obligated to pay pro-rata fixed and additional rent on the portion of the Premises it can occupy.

9.2    **Options to Terminate.**

9.2(a)    **Premises Damage.** If the Building is substantially destroyed or the damage requires more than one hundred eighty (180) days from the date of the damage to repair, either Landlord or Tenant has the option to terminate this Lease by giving written notice within thirty (30) days after the date of the damage (except Tenant shall not have such option if less than twenty-five percent (25%) of the Premises is damaged, in which case the provisions of Paragraph 9.2(b) shall apply). This Lease shall terminate either thirty (30) days after receipt of the notice or the date Tenant vacates the Premises, whichever is sooner.

9.2(b)    **Repairs Requiring Less than 180 Days to Repair.** If the estimated repair time is less than 180 days and Landlord diligently pursues repair for such work to restore the Premises, Tenant may not terminate if repair time runs over 180 days due to causes beyond Landlord's control.

9.2(c)    **Damage During Last Twelve Months of Term.** If casualty damage occurs to the Premises or to the Building during the last twelve (12) months of the Lease Term, Landlord may terminate this Lease by giving written notice within thirty (30) days after the date of the damage.

9.3    **Negligence of Tenant – Uninsured Loss.** An "Insured Loss" is damage caused by an event which is either required to be or which has been elected by Landlord to be covered by insurance described in Paragraph 8.2(a). If casualty damage occurs which is not an Insured Loss and which is due to a negligent or willful act of Tenant, Tenant will repair the damage at its expense and will remain liable for the full rent during repair. Termination under Paragraph 9.2 will not be available to Tenant.

10.    **Real Property Taxes.**

10.1    **Real Estate Tax Proration.** Tenant is responsible under the Lease for paying all real estate taxes relating to the Premises.

10.2    **Payment of Taxes.** Tenant shall pay the Real Property Taxes on the Premises during the Lease Term as and when the same become due and shall deliver to Landlord evidence of payment of same within ten (10) days thereafter. If Landlord pays the Real Property Taxes, then Tenant shall pay Landlord as Additional Rent Tenant's share of the Real Property Taxes as provided in Paragraph 5.2.

Exhibit E

10.3    **Definition of "Real Property Tax".**  The term "Real Property Tax" includes any form of assessment, license fee, levy, penalty or tax (other than inheritance or estate taxes), imposed by an authority with direct or indirect power to tax any legal or equitable interest of Landlord in the real property of which the Premises are a part, but shall not include any corporate franchise or income taxes. In the event the method of taxation applicable to real property shall be adjusted or amended, a modification agreement with respect to this Paragraph shall be entered into to equitably apply the principal hereof to said revised tax system. Any tax abatement shall inure to the benefit of Tenant.

10.4    **Personal Property Taxes.**  Tenant will pay, before delinquent, all taxes assessed against trade fixtures, furnishings, equipment and all other personal property of Tenant. Tenant will cause these items to be assessed and billed separately from the real property of Landlord.

11.    **Utilities.**  Tenant will pay directly to the appropriate supplier, the cost of all water, sewer, gas, heat, light, electrical, telephone, refuse disposal and other utilities and services supplied to the Premises, and any taxes on those bills.

12.    **Assignment and Subletting.**

12.1    **Landlord's Consent Required.**  Tenant will not voluntarily or by operation of law assign, transfer, mortgage, sublet or otherwise transfer or encumber all or any part of Tenant's interest in this Lease or in the Premises without Landlord's prior written consent, which consent may not be unreasonably withheld by Landlord. Any attempted assignment, transfer, mortgage, encumbrance or subletting without consent shall be void as against Landlord and shall constitute a breach of the Lease.

12.2    **No Release of Tenant.**  Regardless of Landlord's consent, no subletting or assignment will alter the primary liability of Tenant to pay the rent and to perform all other obligations to be performed by Tenant. Acceptance of rent from any other person will not be deemed a waiver by Landlord of any provision of this Lease. Consent to one assignment or subletting will not be deemed consent to any subsequent assignment or subletting.

12.3    **Participation by Landlord.**  In the event of any assignment or sublease, involving rent in excess of the Fixed Minimum Rent and Additional Rent required under this Lease (Excess Rent), Landlord shall participate in the Excess Rent. Tenant shall promptly forward to Landlord fifty percent (50%) of all such Excess Rent collected from the assignee or subtenant and shall supply Landlord with true copies as executed of all assignments and subleases.

13.    **Defaults; Remedies.**

13.1    **Events of Default.**  It is a default under this Lease if any of the following "Events of Default" happens:

    (a)    if any Fixed Minimum Rent is not paid when due and default continues for a period of ten (10) days after written notice of default is delivered to Tenant; or

    (b)    if any Additional Rent is not paid when due and default continues for a period of ten (10) days after written notice of default is delivered to Tenant; or

    (c)    if the provisions of Paragraph 6.3 are not fully complied with; or

Exhibit E

(d)    if Tenant defaults under any of the terms of this Lease other than those in 13.1 (a), (b) and (c), and default continues for 15 days after written notice (except if default cannot be completely cured within fifteen (15) days, it will not be an Event of Default if Tenant starts to cure within the fifteen (15) day period, and in good faith continually proceeds to remedy the default); or

(e)    if Tenant or any person who has guaranteed Tenant's performance under this Lease, files a voluntary petition in bankruptcy or is adjudicated a bankrupt or insolvent, or files a petition or answer seeking relief under any federal, state or other statute or regulation, or seeks or consents or acquiesces in the appointment of a trustee, receiver or liquidator of Tenant or guarantor, or of all or any substantial part of Tenant's properties or of the Premises or any or all rents, earnings, or income or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts generally as they become due; or

(f)    if a petition is filed against Tenant, or any person who has guaranteed Tenant's performance under this Lease, seeking relief under any federal, state or other statute or regulation, which remains undismissed or unstayed for an aggregate of sixty (60) days (whether or not consecutive), or if a trustee, receiver or liquidator of Tenant or guarantor, or of all or any substantial part of its properties or of the Premises or any or all rents, or income is appointed with or without the consent or acquiescence of Tenant, or guarantor, and the appointment remains unvacated or unstayed for an aggregate of sixty (60) days (whether or not consecutive).

(g)    in the event Tenant or Tenant's subsidiary or affiliate shall lease other premises from Landlord, any default under such other leases shall be deemed to be a default under this Lease and Landlord may enforce all rights and remedies for an Event of Default herein.

In no event shall Landlord be required to give any notice of default under this paragraph 13.1 more than two (2) times in any lease year or more than ten (10) times during the term of the Lease.

13.2    **Notice; Termination.**  Landlord, at any time after the happening of an Event of Default, may declare an Event of Default by written notice to Tenant specifying the Event(s) of Default.  In the same or a later written notice, Landlord may elect that this Lease Terminate at 5:00 p.m. on the date listed by Landlord.  The date will be at least five (5) days after giving of the termination notice (including the termination date).  On the date in the notice, subject to Paragraph 13.4, the Lease and all interests demised will terminate and all rights of the Tenant shall cease.  The termination will not take place if before the stated date and time:

(a)    Tenant has paid all arrears of Fixed Minimum Rent and Additional Rent and other amounts payable by Tenant (together with interest pursuant to Paragraph 24.10) and as Additional Rent all expenses (including, without limitation, attorneys' fees and expenses) incurred by Landlord due to any default by Tenant (the "Arrearages"); and

(b)    all other defaults have been cured to the satisfaction of Landlord.

Exhibit E

13.3 **Repossession; Reletting.**  After termination as provided in Paragraph 13.2, Landlord may repossess the Premises by summary proceedings, ejectment or otherwise, and may remove Tenant and all other persons and any and all property from the Premises.  After such repossession, Landlord may (but is under no obligation) re-let the Premises, any part thereof, or the Premises with additional premises, on account of Tenant (until Landlord makes demand for final damages), in Tenant's or Landlord's name, without notice to Tenant, for a term (which may be more or less than the period which would have been the balance of the term of this Lease) and on conditions (including concessions, periods of rent free use or alterations) and for purposes which Landlord determines and Landlord may receive the rents.  Landlord is not liable for failure to collect any rent due upon any such reletting.  In the event of any re-entry, Landlord may remove all persons from the Premises, and Landlord may remove all property located in or about the Premises.  At Landlord's option, it may either place such property in a public warehouse at the cost and risk of Tenants or sell such property in whole or in part in the manner and after giving Tenant at least 14 days prior written notice and such other notices as required by the laws of the State of Missouri, to the highest bidder for cash, with or without such property being present at the sale.  Any such sale shall bar any right of redemption by Tenant.  The proceeds shall be applied first to the payment of all reasonable costs and expenses incurred by Landlord in taking and removing such property, including without limitation, reasonable attorneys' fees, then to the payment of any rent or other amounts owing to Landlord and finally the balance remaining, if any, shall be paid to Tenant.  In addition to all rights of Landlord specified herein, Landlord shall be entitled to all other rights provided in law or equity.  The various rights, options and remedies of Landlord contained in this Lease shall be cumulative, and no one of them shall be construed as exclusive of any of the others.

13.4 **Survival of Tenant's Obligations; Damages.**  No provisions in Paragraphs 13.1, 13.2 and 13.3 will relieve Tenant of its liability and obligations under this Lease, all of which will survive. Landlord will not be deemed to accept a surrender of Tenant's lease or otherwise discharge Tenant because Landlord takes or accepts possession of the Premises or exercises control over them as provided.  Acceptance of surrender and discharge may be done only by an instrument executed on behalf of Landlord by its duly authorized officer or employee.

In the event of termination and/or repossession following an Event of Default, Tenant will pay to Landlord the Arrearages up to the earlier of the date of termination or repossession.  Further, Tenant, until the end of what would have been the term of this Lease in the absence of termination and whether or not the Premises or any part have been re-let, is liable to Landlord for, and will pay to Landlord, as liquidated and agreed "Current Damages" for Tenant's default:

(a)  the Fixed Minimum Rent and all Additional Rent and other charges payable by Tenant or which would be payable if this Lease had not terminated, plus all Landlord's expenses in connection with any reletting, including, without limitation, repossession costs, brokerage commission, legal expenses, attorneys' fees, expenses of employees, alteration costs, and expenses of preparation for such reletting, LESS

(b)  the net proceeds, if any, of any reletting on account of Tenant pursuant to Paragraph 13.3.  If the Premises have been relet with additional premises, the net proceeds, if any, of reletting shall be prorated.

Tenant shall pay Current Damages to Landlord monthly on the days on which the Fixed Minimum Rent would have been payable if the Lease were not terminated, and Landlord is entitled to recover from Tenant each month.

Exhibit E

14.    **Condemnation.**

14.1    **Permanent Condemnation.**  If the Premises or any portion are taken under the power of eminent domain or sold under the threat of the exercise of the power (both called "Condemnation"), this Lease will terminate as to the part taken as of the first date the condemning authority takes either title or possession.  If the portion of the Premises taken is more than twenty-five percent (25%) of the Building or makes the balance unfit for Tenant's use, Tenant has the option to terminate this Lease as of the date the condemning authority takes possession.  The option must be exercised in writing as follows:

(a)    within thirty (30) days after Landlord or the condemning authority has given Tenant written notice of the taking; or

(b)    absent notice, within ten (10) days after the condemning authority has taken possession.

If Tenant does not terminate, this Lease will remain in full force and effect as to the portion of the Premises remaining.  The rent will be proportionately reduced.

Any award for Condemnation is the Landlord's, whether the award is made as compensation for diminution in value of the leasehold or for the taking of the fee, or as severance damages.  Tenant is entitled to any award for damage to Tenant's trade fixtures and removable personal property and moving expenses.  If this Lease is not terminated, Landlord, to the extent of severance damages received, will repair damage to the Premises caused by Condemnation except to the extent that Tenant has been reimbursed by the condemning authority.  Tenant will pay any amount in excess of the severance damages required to complete the repair.

14.2    **Temporary Condemnation.**  Upon Condemnation of all or a part of the Premises for temporary use, this Lease will continue without charge or abatement in Tenant's obligations, as between Landlord and Tenant.  Tenant is entitled to the award made for the use.  If the Condemnation extends beyond the term of the Lease, the award will be prorated between Landlord and Tenant as of the expiration date of the Lease Term.  Tenant is responsible for the cost of any restoration work required to place the Premises in the condition they were in prior to Condemnation unless the release of the Premises occurs after termination.  In such case, Tenant will assign to Landlord any claim it may have against the condemning authority.  If Tenant has received restoration funds, it will give the funds to Landlord within fifteen (15) days after demand.

15.    **Force Majeure.**  If Landlord's performance of any obligations under any provision in this Lease is delayed by an act or neglect of Tenant, Act of God, strike, labor, dispute, unavailability of materials, boycott, governmental restrictions, riots, insurrection, war, catastrophe, or act of the public enemy, the period for the beginning or completion of the obligation is extended for a period equal to the delay.  The term "Act of God" is intended to include inclement weather such as, but not limited to, rain, snow, excessive cold or heat as well as more, but not limited to, disastrous events such as tornadoes, hurricanes and earthquakes.  Notwithstanding the foregoing, the date for delivery of possession of the Premises pursuant to Paragraph 3.3 above, shall be extended pursuant to this paragraph only to the extent that the force majeure delays exceed twenty-eight (28) days in the aggregate.

16.    **Subordination.**  This Lease will be subordinate to any form of security now or later placed on the Premises and to all advances made on the security and to all renewals, modifications, consolidations, replacements and extensions, so long as Landlord delivers to Tenant the agreement of Landlord's

Exhibit E

lender that Tenant's right to quiet possession of the Premises will not be disturbed if Tenant is not in default under this Lease, unless it is otherwise terminated under the terms of this Lease. If any mortgagee, trustee or ground lessor elects to have this Lease prior to the lien of its security, and gives written notice to Tenant, the Lease will be deemed prior to the security, whether dated before or after the date of the security, or the recording date. Tenant agrees to execute any required documents, and Tenant irrevocably appoints Landlord as Tenant's attorney-in-fact to do so, if Tenant fails to so execute within ten (10) days after written demand.

17.  **Tenant Estoppel.** Tenant agrees to deliver to Landlord within ten (10) days after receipt of written request therefor from Landlord, a Tenant Estoppel Certificate in such form as Landlord may reasonably request.

Tenant's failure to deliver the estoppel within said time will be conclusive upon Tenant (i) that this Lease is in full force and effect, without modification, except as may be represented by Landlord, (ii) that any security deposit is as represented by Landlord, (iii) that there are no uncured defaults in Landlord's performance, and (iv) that not more than one month's rent has been paid in advance.

18.  **Authority**. If Tenant is a corporation or limited liability company, each individual executing this Lease on behalf of the corporation or limited liability company represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of the corporation or limited liability company and that this Lease is binding upon the corporation or limited liability company.

19.  **Notices.** All notices required or permitted under this Lease shall be in writing and shall be deemed duly given upon personal delivery or three (3) days after being sent by United States, certified or registered mail, return receipt requested, or one (1) day after being sent for next day delivery by Federal Express or other major overnight courier that provides evidence of delivery, addressed to Landlord or Tenant, respectively, at the address provided in the Information Schedule.

Either party by notice as provided above may change the address for notices and/or payment of rent.

20.  **Agency Disclosure.** Lessor and Lessee acknowledge that _____NA_____ (the Lessee's real estate broker in this transaction) is the agent of the Lessee, with all fiduciary responsibilities to the Lessee (not the Lessor). Furthermore, Lessor and Lessee acknowledge that _____NA_____ (the Lessor's real estate broker in this transaction) is the agent of the Lessor, with all fiduciary responsibilities to the Lessor (not the Lessee). Lessee, Lessor and the real estate licensees acknowledge that these brokerage relationships, if required by rule or regulation, were disclosed to the Lessor or Lessee or their respective agents no later than the first showing, upon first contact or immediately upon the occurrence of any change to the relationship. Lessee and Lessor further acknowledge that they have received the Broker Disclosure Form prescribed by the Missouri Real Estate Commission (MREC).

21. **Landlord's Access.** Landlord and Landlord's agents have the right to enter the Premises at reasonable time for the purpose of inspecting, showing the Premises to prospective purchasers, tenants, lenders, and making alterations, repairs, improvements or additions to the Premises or to the Building that Landlord deems necessary or desirable. Landlord may place any ordinary "For Sale" or "For Lease" signs on the Premises or the Building, without rebate of rent liability.

22. **Landlord's Liability.** The term "Landlord" means only the owner or owners of the fee title at the time in questions. If the Landlord (or the then grantor) transfers any title or interest, from and after the date of transfer, the Landlord (or the then grantor) is relieved of all liability for Landlord's obligations accruing after the date of such transfer. Any Security Deposit not delivered to the grantee is excepted. Landlord's obligations under this Lease shall thereafter be binding on Landlord's successors and assigns. Tenant agrees to attorn to any transferee or lender of Landlord.

23. **Landlord's Right.** If Tenant fails to make any required payment or defaults in performing any other term in this Lease, Landlord may, but need not (and without waiving the default), make such payment or remedy other defaults for Tenant's account and at Tenant's expense, immediately and without notice in case of emergency, otherwise on five (5) days written notice to Tenant. The costs, with interest under Paragraph 24.10, is due as Additional Rent with Tenant's next Fixed Minimum Rent installment.

24. **Miscellaneous.**

24.1 **Time of Essence.** Time is of the essence under this Lease.

24.2 **Covenants and Conditions.** Each provision of this Lease performable by Tenant is both a covenant and a condition.

24.3 **Captions.** Article and paragraph captions are only for convenience.

24.4 **Incorporation of Prior Agreements, Amendments.** This Lease contains all agreements of the parties with respect to any matter mentioned. No prior agreement or understanding is effective after execution of this Lease. This Lease may be modified in writing only, signed by the parties. The exhibits listed on the Information Schedule and attached to this Lease are part of this Lease as fully as if placed in the body of the Lease.

24.5 **Cumulative Remedies.** No remedy or election is exclusive, but wherever possible, is cumulative with all other remedies at law or in equity.

24.6 **Severability.** The invalidity of any provision of this Lease as determined by a court of competent jurisdiction, shall not affect the validity of any other provision.

24.7 **Merger.** The voluntary or other surrender by Tenant or a mutual cancellation will work a merger, and at Landlord's option, will terminate existing subtenancies or operate as an assignment of subtenancies.

**24.8    Holding Over.**  If Tenant retains possession after the Lease Term expires, without the written consent of Landlord, the occupancy will be a tenancy from month-to-month at a rent in the amount of twice the last Fixed Minimum Rent plus all Additional Rent and other charges payable, and upon all other terms contained herein.  Any options (i.e. renewal, expansion) and rights of first refusal contained in the Lease are terminated in the event of a holdover tenancy.

**24.9    Waivers.**  Waiver by Landlord of any provision is not a waiver of any other provision or of any subsequent breach by Tenant of the same or any other provision.  Landlord's consent or approval of any act will not make it unnecessary to obtain Landlord's consent or approval in the future.  The acceptance of rent is not a waiver of any breach by Tenant other than a failure of Tenant to pay the particular rent accepted, regardless of whether Landlord knows of such a breach.

**24.10    Interest on Past-Due Obligations.**  Any amount due to Landlord not paid when due will bear interest from the date due at the prime lending rate in effect from time to time at the Chase Manhattan Bank, N.A. in New York City or such other bank as Landlord may notify Tenant from time to time, or the highest rate of interest payable under the law, whichever is lower.  Payment of interest will not cure any default by Tenant under this Lease except as expressly provided.

**24.11    Attorney Fees.**  If either party brings an action regarding terms or rights under this Lease, the prevailing party in any action, on trial or appeal, is entitled to reasonable attorneys' fees as fixed by the court to be paid by the losing party.  The term "attorneys' fees" shall include, but is not limited to, reasonable attorneys' fees incurred in any and all judicial, bankruptcy, reorganization, administrative or other proceeding, including appellate proceedings, whether the proceedings arise before or after entry of a final judgment and all costs and disbursements in connection with the matter.  If either party retains an attorney to enforce any of its rights hereunder, the non-defaulting party shall pay the other party's attorney's fees, whether or not suit is commenced.

**24.12    Waiver of Jury Trial.**  Landlord and Tenant each waive trial by jury in any action, proceeding or counterclaim brought by either of the parties to this Lease against the other in any matter whatsoever arising out of or in any way connected with this Lease or its termination, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, and/or any claim of injury or damage and any emergency statutory or any other statutory remedy.

**24.13    Recording.**  Tenant will not record this Lease or any memorandum thereof without Landlord's written consent.  Any recordation, at Landlord's option, will constitute a non-curable default of Tenant.  Notwithstanding the foregoing, Tenant may record a memorandum of tenant's option to purchase hereunder and may record any subordination, non-disturbance and attornment agreement executed by the holder of a mortgage or deed of trust encumbering the Premises.

**24.14    Signs and Auctions.**  Tenant shall not place any sign upon or conduct any auction on the Premises without Landlord's prior written consent, which shall not be unreasonably withheld.

**24.15    Security.**  Tenant acknowledges that the rents reserved in this Lease do not include the cost of security guards or other security measures, and that Landlord has no obligation to provide such services.  Tenant assumes all responsibility for the protection of Tenant, its agents, employees and invitees from acts of third parties.

Exhibit E

24.16  **Easements and Restrictive Covenants.**  Landlord reserves the right to grant and record easements, cross easements, rights, restrictive covenants and conditions and dedications which it deems necessary or desirable.  The grants will not unreasonably interfere with Tenant's use of the Premises.  Tenant agrees to promptly execute documents requested by Landlord.  Failure to execute will be a material breach under this Lease.

24.17  **Rules and Regulations**.  Tenant will comply with Landlord's reasonable rules and regulations respecting the Premises.  Notice of the rules and regulations will be posted or given to the Tenant.

24.18  **Binding Effect; Choice of Law.**  Subject to provisions restricting assignments or subletting and to the provisions of Paragraph 22, this Lease will bind the parties, their personal representatives, successors and assigns.  This Lease shall be governed by the laws of the State of Missouri.

24.19  **Absence of Option.**  The submission of this Lease for examination does not constitute a reservation of or an option for the Premises and this Lease becomes effective only upon execution by Landlord.

24.20  **Renewal Option.**  Provided that Tenant is not in default of this Lease, Tenant shall have the option to renew this lease for one (1), 5-year term on mutually agreeable terms.  These options require six (6) months written notice prior to lease expiration to exercise.

24.21  **Continuing Guaranty.**  This effectiveness of this Lease is conditioned upon the full execution of the Continuing Guaranty attached as Exhibit B and incorporated by reference by all named Guarantors.

Both parties acknowledge that they have reviewed this Lease thoroughly and have given their voluntary consent to the provisions.  The Landlord and Tenant agree that, at execution, the terms are commercially reasonable and show the intent of the parties.

The parties have executed this Lease on the dates specified below.

**LANDLORD:**                                **TENANT:**

Jiva Resources Inc.                          Tiger Hemp Hemp Company

By:    Li Cheng                              By:    Jerred Killoren

Signature:_____                    Signature:_____

Title:    Managing Partner                   Title:    CEO

Date:    _____                     Date:    1-6-2022

**Exhibit A. Eagle Industrial Park Map**

## Eagle Industrial Park Site Map



# ACORD®

## CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)**
9/7/2022

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

**IMPORTANT:** If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| The Daniel and Henry Co. 1001 Highlands Plaza Drive West Suite 500 Saint Louis, MO 63110 | PHONE (A/C, No, Ext): (314) 421-1525 | | FAX (A/C, No): (314) 444-1990 |
| | E-MAIL ADDRESS: info@danielandhenry.com | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| | INSURER A : ACUITY | | 14184 |
| INSURED | INSURER B : | | |
| Tiger Fiber, Inc. 222 S Central Avenue Saint Louis, MO 63105 | INSURER C : | | |
| | INSURER D : | | |
| | INSURER E : | | |
| | INSURER F : | | |

## COVERAGES        CERTIFICATE NUMBER:        REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X **COMMERCIAL GENERAL LIABILITY** | | | ZL3352 | 11/4/2021 | 11/4/2022 | EACH OCCURRENCE | $ 3,000,000 |
| | ☐ CLAIMS-MADE X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ 300,000 |
| | | | | | | | MED EXP (Any one person) | $ 10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $ 1,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ 3,000,000 |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ 3,000,000 |
| | ☐ OTHER: | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ **UMBRELLA LIAB** ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ **EXCESS LIAB** ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** Y / N | | | | | | ☐ PER STATUTE ☐ OTHER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) | | N/A | | | | E.L. EACH ACCIDENT | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)**
As respects to location: 2401 Mississippi Avenue, Building 17, Sauget, IL 62201

The General Liability policy extends to this location for limits indicated.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Jiva Resources, Inc. 2401 Mississippi Ave. Sauget, IL 62201 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | **AUTHORIZED REPRESENTATIVE** *John R. Drew* |

**ACORD 25 (2016/03)**

© 1988-2015 ACORD CORPORATION. All rights reserved.
The ACORD name and logo are registered marks of ACORD

Exhibit E